**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Norfolk Division)**

| | |
|---|---|
| **MINNESOTA LAWYERS MUTUAL INSURANCE COMPANY** ) <br> 333 South Seventh Street, Suite 2200 ) <br> Minneapolis, Minnesota 55402 ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **KEVIN B. RACK** ) <br> ) <br> and ) <br> ) <br> **RACK & MOCCIA, P.C.** ) <br> ) <br> and ) <br> ) <br> **BENJAMIN C. BANKS** ) <br> ) <br> and ) <br> ) <br> **CAROL DUVAL** ) <br> ) <br> **Defendants.** ) | Case No.: 2:19-cv-38 |

**COMPLAINT**
**(Declaratory Judgment)**

Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM"), by counsel, for its cause of action against Defendants Kevin B. Rack ("Rack"), Rack & Moccia, P.C. ("R&M"), and Benjamin C. Banks ("Banks"). states as follows:

**JURISDICTION**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

**VENUE**

2. Venue is appropriate in this Circuit pursuant to 28 U.S.C. § 1391(b)(2).

1

## PARTIES

3. Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM") is a mutual insurance company organized under the laws of Minnesota with its principal place of business in Minnesota.

4. Defendant Kevin B. Rack is a resident of Virginia and a principal of R&M.

5. R&M is a law firm headquartered in Virginia Beach, Virginia.

6. Benjamin Banks and Carol Duval are residents of Virginia.

## FACTS

### *The Underlying Lawsuit*

7. Rack is a party to a lawsuit brought in the Circuit Court of the City of Virginia Beach styled <u>Kevin B. Rack, Co-Trustee of the Benjamin O. Colonna Child's Trust v. Carol C. DuVal, Individually and as Co-Trustee of the Benjamin O. Colonna Child's Trust and Benjamin C. Banks</u> (the "Lawsuit").

8. The Lawsuit asserts that Benjamin Banks ("Banks") is a residual beneficiary of the Benjamin O. Colonna Child's Trust (the "Trust"); that Banks' mother, Carol DuVal ("DuVal"), is a life beneficiary of the Trust, that Rack has served as independent trustee of the Trust, with DuVal a co-trustee, that DuVal has been receiving disbursements of trust principal as well as income, and that Banks has challenged the authority of Rack to approve such distributions of principal.

9. On September 28, 2017, DuVal filed a *pro se* response to the petition, asserting that as a non-lawyer, she "relied on the advice of [Rack] as an attorney specializing in trusts and estates."

10. On October 10, 2017 Banks brought a Counterclaim in the Lawsuit against Rack (the "Counterclaim"). In the Counterclaim Banks alleged that when Rack became co-trustee of the Trust, the Trust held principal property valued at $1.6 million, Counterclaim ¶ 11; that Rack "repeatedly and wrongfully invaded the trust principal", ¶ 10; that his actions constituted gross negligence, ¶ 19; that Rack used $6,000 of trust moneys to pay his legal fees in an unrelated matter that was the subject of a bar complaint filed by Carol DuVal ("DuVal"), ¶ 21; and that prior to filing the petition, Rack offered to allow Banks to substitute for him as co-trustee in exchange for an agreement to indemnify Rack and hold Rack harmless for his actions as trustee, ¶ 24. The Counterclaim sought relief including Rack's removal as trustee and an order requiring Rack to restore trust principal.

11. On October 31, 2017, Rack filed a counterclaim against DuVal, individually and as co-trustee, for contribution and indemnification.

12. Banks filed a Motion for Leave to Amend on October 10, 2017, and an Amended Counterclaim thereafter. According to the Amended Counterclaim, at ¶ 28, Rack began distributing trust principal to DuVal in 2008, leaving it "practically depleted" by 2018.[1]

### Events Prior to Commencement of the Underlying Lawsuit

13. Rack's firm, R&M, had provided estate planning services to William DuVal prior to his death. After his death, the firm provided legal advice to Carol DuVal ("DuVal") regarding the estate's assets.

14. In 2007, Rack began serving as independent co-trustee of the Benjamin O. Colonna, Jr. Child's Trust (the Trust"). The terms of the Trust provided for distributions of income to DuVal, with all Trust assets going to DuVal's son Benjamin Banks at DuVal's death.

---

[1] A copy of the Amended Counterclaim is attached as Exhibit A hereto.

15. At some point thereafter, Rack authorized discretionary disbursements of trust principal to DuVal. In an August 5, 2011 letter to Duval, however, Rack wrote that "there is ambiguity" regarding the ability of the trustee to distribute principal to DuVal. Rack suggested that this problem could be resolved through a Non-Judicial Settlement Agreement.[2]

16. By letter to DuVal dated July 11, 2012, Rack wrote again to DuVal regarding discretionary disbursements of Trust principal to DuVal and concerns regarding an "apparent restriction" in the language of the Trust limiting distributions to her to "income only." He enclosed with his letter a draft "Non-Judicial Settlement Agreement" (the "Agreement"), the "essence" of which was a provision granting authority to the independent trustee "to make discretionary distributions of principal to you during your lifetime."[3] The letter stated, "Given that the current annual income from the trust investments is in a range of less than $10,000, the permission to distribute discretionary amounts of principal is critical if we are to continue on with the current monthly distribution plan . . . ."[4]

17. The Agreement itself recited that Rack had been appointed as Successor Co-Trustee of the Trust; that the trust beneficiaries were DuVal and Justin Banks, a minor, and that DuVal and Banks were "the interested parties to the Child's Trust whose consent would be required in order to achieve a binding settlement." The Agreement then stated that the Trust did not allow Ms. DuVal to withdraw principal from the trust; that it was silent as to the trustee's right to make discretionary distributions of principal to Ms. DuVal; and that Ms. DuVal and Mr. Banks agree that the trust shall be interpreted to allow Mr. Rack as Trustee to do so.

---

[2] A copy of the August 15, 2011 letter is attached as Exhibit B hereto.
[3] A copy of the Agreement is contained in Exhibit C hereto.
[4] A copy of the July 11, 2012 letter is contained in Exhibit D hereto.

18. The Agreement included an Indemnification and Hold Harmless Agreement whereby the Beneficiaries "agree to indemnify and hold harmless" Rack and any successor trustee "who relies in good faith on this Agreement," "to the extent of the amount of principal distributed" to Ms. DuVal, "and from any and all liability arising from such distribution." The Agreement also provided that the Beneficiaries waive any claims they might have against Mr. Rack "arising from or as a result of or incident to any distribution of principal made in accordance with this Agreement."

19. The Agreement stated that Mr. Rack would rely on the representations, warranties and agreements contained in the Agreement "in determining whether to make discretionary distributions of principal" to DuVal.

20. Notwithstanding the trust beneficiaries' failure to execute the settlement agreement in 2012, Rack continued his efforts to get DuVal and Banks to do so. Thus, on July 26, 2016, Rack wrote Banks, "[a]s we discussed, the current plan is to circulate the non-judicial settlement agreement which will clarify the provisions for distributions and disbursements . . . to comport with the intention and interpretation of the Child's Trust since inception."[5]

21. Neither DuVal nor Banks ever executed the settlement agreement. Instead, at some point in early 2017, DuVal lodged a bar complaint against Rack, which he addressed in a July 19, 2017 email to DuVal, stating, "[i]t appears you did not withdraw your bar complaint after you came to see me, as you promised." * * * The challenging comments of your son as you related to me (in the context of your regrettable bar complaint), combined with your contentious comments towards me, make it imperative for me as a Trustee to follow the necessary and prudent course to seek a judicial interpretation of the meaning of the dispositive terms of the

---

[5] A copy of the July 26, 2016 letter is attached as Exhibit E hereto.

Colonna Child's Trust. You two have left me no choice, but at least this will give you both an opportunity to voice your opposing opinions in court about the intentions of Mr. and Mrs. [Colonna] for this trust."

22. Thereafter, on September 12, 2017, Rack filed a Petition for Aid and Guidance to determine whether "the terms of the trust authorize [Rack] to distribute principal" to DuVal.

23. After Banks filed his October 10, 2017 Counterclaim to the Petition, on October 31, 2017 Rack filed an Answer to Banks' Counterclaim and a counterclaim against DuVal, individually and as co-trustee, for contribution and indemnification.

### *Reporting of the Banks Claim to MLM*

24. On March 2, 2018, nearly five months after Banks filed his counterclaim against Rack, R&M reported a claim against Rack by Banks. R&M provided MLM with copies of the Petition for Aid and Direction, Banks' Counterclaim, and certain related documents. MLM appointed defense counsel to represent Rack in defense of Banks' Counterclaim under a reservation of rights.

### **POLICY PROVISIONS**

25. MLM issued a Lawyers Professional Liability Policy, Policy No. 22223-12, to RACK & MOCCIA, PC in Virginia Beach, Virginia, for the Policy Period from January 3, 2017 to January 3, 2018.[6]

Relevant portions of the Policy are set forth below.

Under the **COVERAGE** section, the Policy provides, in relevant part:

We will pay, subject to OUR limit of liability, all DAMAGES the INSURED may be legally obligated to pay and CLAIM EXPENSE(S), due to any CLAIM, provided that:

---

[6] A copy of the Policy is attached as Exhibit F hereto.

(1)       The CLAIM arises out of any act, error or omission of the INSURED or a person for whose acts the INSURED is legally responsible;

\* \* \*

(4)       The CLAIM is deemed made during the POLICY PERIOD; and

(5)       The CLAIM is reported to US during the POLICY PERIOD or within 60 days after the end of the POLICY PERIOD.

A CLAIM is deemed made when:

\* \* \*

(2)       an INSURED first becomes aware of any actual or alleged act, error or omission by any INSURED which could reasonably support or lead to a CLAIM.

\* \* \*

Under the **DEFINITIONS** section, the Policy provides in relevant part:

CLAIM(S) means:

\* \* \*

(4)       any act, error or omission by any INSURED which could reasonably support or lead to a demand for such DAMAGES.

\* \* \*

The **REPRESENTATION IN APPLICATION** section in the Virginia Changes Endorsement to the Policy, provides in relevant part:

The application for coverage is a part of this policy.

No statement in any application or affidavit made before or after loss under this policy shall bar a recovery upon this policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue.

By acceptance of this policy the INSURED agrees:

(1)       the statements in the application are the representations of all INSUREDS;
(2)       such representations are material as this policy is issued in reliance upon the truth of such representations;

\* \* \*

The Policy's Renewal Application's "Claims, Potential Claims and Disciplinary" section, signed electronically by Rack on November 4, 2016, provides, in relevant part, as follows:

> AS DEFINED BY THE POLICY, THE TERM "CLAIM" MEANS A DEMAND OR SUIT RECEIVED BY THE INSURED FOR MONEY OR SERVICES. IT ALSO MEANS ANY INCIDENT WHICH COULD REASONABLY SUPPORT SUCH A DEMAND OR ANY COMMUNICATION OR NOTICE TO THE INSURED OF A POTENTIAL CLAIM.

\* \* \*

> 10. Are you aware of **any** incidents which could **reasonably** result in a claim being made against you?  _____ yes  __x__ no

The Application's WARRANTY STATEMENT, executed November 28, 2016, provided in relevant part,

> The undersigned authorized representative of the firm certifies that:

\* \* \*

> \*   After having made inquiry of all firm attorneys, is not aware of any claims or circumstances that could result in claims or disciplinary proceedings that have not been reported to Minnesota Lawyers Mutual.
>
> \*   All known claims, lawsuits, incidents, and/or disciplinary proceedings have been reported to the present or previous insurance carriers, and the undersigned, after having made inquiry of all firm attorneys, has no knowledge if any threatened litigation or existing fact or situation which could result in a claim or disciplinary action being filed against the firm.

\* \* \*

26. In the application, Rack also certified, by electronic signature dated November 4, 2016, that "all known claims, lawsuits, incidents, and disciplinary proceedings have been reported to the present or previous insurance carriers and the applicant has no knowledge of any threatened litigation or existing fact or situation which could result in a claim being filed against the firm." Rack further certified that "[f]ailure by the applicant to report any known claim,

8

lawsuit, incident, and disciplinary investigation or any known facts which may result in a claim, to current or previous insurers may result in the declination of coverage for these matters by current or previous insurers."

## COUNT I
### (Declaratory Judgment)

*No Duty to Defend Exists Because Banks'*
*Claim Is Deemed Made Prior to the Policy Year*
*In Which the Claim was Reported.*

27. The Banks claim was first reported to MLM within sixty days following the end of the policy period of the 2017-18 Policy. Consequently, the 2017-18 Policy is the policy applicable to the Banks claim.

28. In order to come within the coverage of the Policy, the Banks claim must be deemed made during the Policy period of the 2017-18 Policy.

29. Under the relevant terms of the Policy, a claim is deemed made when "an INSURED first becomes aware of any actual or alleged act, error or omission by any INSURED which could reasonably support or lead to a CLAIM."

30. Prior to the 2017-18 Policy period, Rack knew that he had authorized distributions to DuVal of trust principal notwithstanding Rack's assessment that the Trust contained an "apparent restriction" limiting distributions to her to "income only."

31. Rack's awareness that the act of authorizing such distributions of principal could lead to a claim against him was so acute that he sought an agreement whereby the Beneficiaries would "agree to indemnify and hold harmless" Rack and any successor trustee "who relies in good faith on this Agreement," "to the extent of the amount of principal distributed" to Ms. DuVal, "and from any and all liability arising from such distribution."

32. The Agreement also provided that the Beneficiaries waive any claims they might have against Mr. Rack "arising from or as a result of or incident to any distribution of principal made in accordance with this Agreement."

33. In Rack's July 11, 2012, letter to DuVal accompanying the draft settlement agreement, in which Rack wrote that the Trust contained an "apparent restriction" limiting distributions to her to "income only," Rack emphasized that "the permission to distribute discretionary amounts of principal **is critical** if we are to continue on with the current monthly distribution plan." (emphasis added.)

34. When the Beneficiaries did not execute the agreement in 2012, Rack continued to pursue such an agreement in 2014, when Banks again declined to agree to a waiver, and again in 2016.

35. By November 4, 2016, Rack knew that DuVal and Banks had been resisting execution for some five years of the "critical" settlement agreement waiving potential claims against him. Thus, by November 4, 2016, Rack was aware of an actual or alleged act, error or omission by Rack which could reasonably support or lead to a CLAIM against Rack.

36. Banks' present claim is thus one that is deemed made prior to the beginning of the 2017-18 policy period in which it was reported. As such, under the terms of MLM's "claims made and reported policy," no potentiality of coverage exists for Banks' claims against Rack; and MLM does not owe Rack a duty to defend Banks' Counterclaim.

***MLM Owes No Duty to Defend Rack Because Rack's Approval of Principal Distributions From the Trust Was an "Incident" "Which Could Reasonably Support or Lead to a Claim" Against Rack But Was Not Disclosed on Rack's Policy Renewal Application.***

37. In the renewal application, which is a part of the Policy, Rack certified on November 4, 2016, that "the applicant has no knowledge of any threatened litigation or existing

fact or situation which could result in a claim being filed against the firm." Rack further certified that "[f]ailure by the applicant to report any known claim, lawsuit, incident, and disciplinary investigation or any known facts which may result in a claim, to current or previous insurers may result in the declination of coverage for these matters by current or previous insurers."

38. In the application, Rack answered "no" to the question, "[a]re you aware of any incidents which could reasonably result in a claim being made against you."

39. Rack's certification and answer were factually false. His years-long effort to obtain waivers from beneficiaries of the Trust holding him harmless from liability for distributions of principal to DuVal despite the "apparent restriction" limiting distributions to her to "income only," which waiver Rack termed "critical" to obtain, means that he was aware of an incident which could reasonably result in a claim being made against him. These facts were also "facts which may result in a claim" and in fact have resulted in the claim at issue in this matter.

WHEREFORE, Plaintiff prays that this Court order the following relief:

a) Determining and adjudicating the rights and liabilities of the parties to Plaintiff's policy of insurance with regard to the existence of any duty to defend;

b) Declaring that MLM has no duty to defend or indemnify Rack or R&M in the Banks Counterclaim;

c) For such other and further relief as is just and equitable.

DATE: January 20, 2019

Respectfully submitted,

MINNESOTA LAWYERS MUTUAL
INSURANCE COMPANY


By: _/s/ Danny M. Howell_
Danny M. Howell (VSB No. 30352)
danny@dmhowelllaw.com

B. Gerard Cordelli (VSB No. 35132)
jerry@dmhowelllaw.com
Robert Jackson Martin, IV (VSB No. 80655)
jackson@dmhowelllaw.com
Law Offices of Danny M. Howell, PLLC
200 Little Falls Road, Suite 207
Falls Church, Virginia 22046
Telephone: (703) 556-8900
Fax:   (703) 237-1224

*Counsel for Minnesota Lawyers Mutual Insurance Company*